UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| DIANE J. EAGLEBARGER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CAUSE NO. 1:11-CV-00038 |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Plaintiff Diane Eaglebarger appeals to the district court from a final decision of the Commissioner of Social Security denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

## I. PROCEDURAL HISTORY

Eaglebarger applied for DIB on December 21, 2007, alleging that she became disabled as of February 11, 2006. (Tr. 34, 156-58, 198.) Her DIB insured status expired on March 31, 2008. (Tr. 164); *see Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997) (explaining that a claimant must establish that she was disabled on or before her date last insured in order to recover DIB benefits). The Commissioner denied Eaglebarger's application initially and upon reconsideration, and she requested an administrative hearing. (Tr. 85-93.) Administrative Law Judge ("ALJ") Jennifer Fisher conducted a hearing on December 1, 2009, at which Eaglebarger

---

[1] All parties have consented to the Magistrate Judge. (Docket # 13); *see* 28 U.S.C. § 636(c).

(who was represented by Attorney John Martin Smith), her husband, and Amy Kutschbach, a vocational expert ("VE"), testified. (Tr. 48-82.)

On January 20, 2010, the ALJ rendered an unfavorable decision to Eaglebarger, concluding that she was not disabled because she could perform a significant number of jobs in the national economy despite the limitations caused by her impairments. (Tr. 34-43.) The Appeals Council denied Eaglebarger's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-30, 409-46.)

Eaglebarger filed a complaint with this Court on January 25, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.) In this appeal, Eaglebarger advances two arguments challenging the ALJ's step five finding: (1) that the evidence fails to show that the jobs cited by the ALJ are actually performed with only occasional handling and fingering by the dominant upper right extremity; and (2) that the ALJ improperly resolved conflicts between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 16-20.)

## II. FACTUAL BACKGROUND

### A. *Personal, Medical, and Vocational Information*

At the time of her date last insured, Eaglebarger was forty-seven years old, had a high school education, and possessed past work experience as a bartender and production machine tender. (Tr. 74, 156, 204, 249.) Eaglebarger alleges that she is disabled due to "a history of lumbar compression fracture, chronic low back pain, neck pain with deformity of the C5 vertebral body osteopenia and hip/spine, right median axonal motor neuropathy, mild right sural sensory nerve neuropathy, . . . right C8-T1 and L4-S1 subacute radiculopathy, and depression."

(Opening Br. 2.)

When asked at the hearing what medical issues keep her from working, Eaglebarger cited constant pain in her low back and legs, spasms and numbness in her right upper extremity, and depression. (Tr. 56.) Eaglebarger reported that she could lift eight to ten pounds, primarily with her left hand; stand for thirty minutes; and sit for thirty minutes. (Tr. 59-60.) She articulated that she has difficulty grasping with her right hand, which is her dominant extremity, and that she becomes "irritable" around others. (Tr. 60-61.)

The record reflects that Eaglebarger was in an automobile accident in 1989, in which she sustained multiple vertebral fractures. (Tr. 349.) From 2003 to 2008, Eaglebarger saw various doctors for her chronic back pain and right upper extremity spasms, as well as in connection with her application for disability benefits. (*See* Tr. 309-404.) It is not necessary, however, to recite Eaglebarger's medical history in detail because in this appeal she challenges only the ALJ's reliance on the VE's testimony at step five. Accordingly, the Court will set forth the VE's testimony, in relevant part.

### B. *The VE's Testimony at the Hearing*

ALJ: Mr. Smith, will you stipulate to Ms. K[ut]schbach's professional qualifications?

ATTY: Yes, Your Honor, I do.

. . . .

ALJ: Okay, And may I assume your testimony today is based on your knowledge, education, training, and experience, and consistent with the Dictionary of Occupational Titles, unless you tell me otherwise?

VE: Yes, Your Honor.

. . . .

3

ALJ: Okay. And I am going to ask you a series of hypothetical questions. I'd like for you to assume a person of the claimant's age, education, and work experience with the limitations I describe. For the first hypothetical, please assume an individual limited to lifting 10 pounds occasionally. The individual's able to stand or walk for 30 minutes at a time for up to two hours in an eight-hour workday. The individual can sit for up to 30 minutes at a time for up to six hours in an eight-hour workday. The person must have the opportunity to periodically alternate between sitting and standing to relieve pain and discomfort, but can remain at the work station and attend to work tasks. The person would be unable to climb ladders, ropes, or scaffolds; unable to kneel; and unable to crawl. However, the person could occasionally climb ramps and stairs, balance, stoop, and crouch. The person would need to avoid all exposure to wet surfaces that would cause a hazard of slipping, would need to avoid moving machinery and unprotected heights. The person would be further limited to work that does not involve understanding, remembering, or carrying out detailed instructions. The work would need to be simple, routine, and repetitive in nature; in a work environment free of fast-paced production requirements; involving only simple work-related decisions; and free of any workplace changes. The person would be further limited to superficial interaction with the public, meaning a casual level of conversation without addressing complaints or concerns. And based on that hypothetical, would the individual be able to perform any of the past work?

VE: No, Your Honor.

ALJ: Are there other jobs that could accommodate those limitations?

VE: I believe so, Your Honor. One such position would be a spotter, 739.687-182. That position is defined as sedentary and unskilled according to the Dictionary of Occupational Titles. There are approximately 100 to 150 of that type of position in the region, approximately 3,000 at the state level, and just over half a million at the national level. . . . A second position that would fit within that hypothetical is a final assembler, 713.687-018. That position is also defined as sedentary and unskilled according to the Dictionary of Occupational Titles. There are approximately 200 to 250 of those type of positions in the region, approximately 10,000 at the state level, and approximately 300,000 at the national level. And there is a third position that would fit within that hypothetical, that being a sorter, 521.687-086. That position is defined as sedentary and unskilled, as well. There are approximately 100 to 150 of that type of position in the region, approximately 3,000 at the state level, and just over 200,000 at the national level.

ALJ: And if we add to that hypothetical question that the individual would be limited to occasional handling or gross manipulation with the right upper extremity, would that impact those jobs?

4

VE: I believe it would impact the jobs, but I think they could still be performed.

ALJ: Okay, Would it reduce the number of jobs that could be performed?

VE: No. I think it would only impair the person's ability to perform as if unhindered. I don't think that the numbers would be reduced. I think the positions could still be performed as they normally are within the . . . national standard. But again, . . . with a person with two able—or, unlimited upper extremities, I think that person could do it faster. But with the occasional handling or gross manipulation of the right upper extremity, I think those positions could still be performed as . . . they're performed in the national economy.

ALJ: On a competitive basis?

VE: Yes. And that, Your Honor, is based on my observation of people employed in those positions, not according to the DOT, because according to the DOT, they either require frequent to constant handling at that level.

ALJ: And if the person were further limited to only occasional fine manipulation or fingering, which would be fine manipulation of items no smaller than a paperclip, with the right hand, would that eliminate the jobs?

VE: I'd . . . say my answer would be the same . . . .

. . . .

ALJ: So, if you have both - - that last hypothetical, I'm talking about having both the handling and the fingering restriction. . . . [T]hat would still be the same answer?

VE: Yes, Your Honor.

(Tr. 71, 75-78.)

### III. ANALYSIS

*A. The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12

5

months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[2] *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); 20 C.F.R. § 404.1520. An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

### B. The ALJ's Decision

On January 20, 2010, the ALJ rendered her decision. (Tr. 34-43.) She found at step one of the five-step analysis that Eaglebarger had not engaged in substantial gainful activity after her alleged onset date through her date last insured. (Tr. 36.) At step two, she concluded that

---

[2] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC") or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

6

Eaglebarger's history of lumbar compression fracture with associated chronic low back pain (lumbago) constituted a severe impairment. (Tr. 36.) The ALJ then at step three determined that Eaglebarger's impairment or combination of impairments were not severe enough to meet a listing. (Tr. 38.)

Before proceeding to step four, the ALJ found that Eaglebarger's testimony of debilitating limitations was not credible to the extent it was inconsistent with the following RFC (Tr. 39):

> [T]hrough the date last insured, the claimant has the residual functional capacity to occasionally lift and/or carry ten pounds; stand and/or walk for two hours in an eight-hour day and sit for six hours in an eight-hour day with the ability to periodically alternate between sitting and standing to relieve pain or discomfort while remaining at her work station and attending to work tasks; occasionally climb ramps or stairs, balance, stoop, or crouch; never kneel, crawl, or climb ladders, ropes, or scaffolds; and occasionally handle objects/perform gross manipulation and finger/perform fine manipulation of items no smaller than the size of a paper clip with her right upper extremity. She would need to avoid exposure to operational control of moving machinery, unprotected heights, and wetness (slippery surfaces). In addition, the claimant can only perform work that does not involve understanding, remembering, or carrying out detailed instructions and is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements and involving only simple, work-related decisions with few, if any, work place changes and no more than casual interaction with the public, supervisors, or co-workers, meaning that the job requires working primarily with things and not people.

(Tr. 38). Based on this RFC and the VE's testimony, the ALJ concluded at step four that Eaglebarger was unable to perform her past relevant work as a bartender and production machine tender. (Tr. 41.) The ALJ concluded at step five, however, that through her date last insured she could perform a significant number of other jobs within the economy, including spotter, final assembler, and sorter. (Tr. 42.) Therefore, Eaglebarger's claim for DIB was denied. (Tr. 43.)

7

*C. The ALJ's Step Five Finding Is Supported by Substantial Evidence*

Eaglebarger challenges the ALJ's step five finding in two respects. She first contends that the evidence fails to show that the spotter, final assembler, and sorter jobs cited by the ALJ are actually performed with only occasional handling and fingering by the right upper extremity. Next, she asserts that the ALJ improperly resolved conflicts between the VE's testimony and the DOT. Although each will be discussed in turn, neither of Eaglebarger's arguments is ultimately persuasive.

1. <u>Substantial Evidence Indicates That the Jobs Cited by the ALJ Are Actually Performed With Only Occasional Handling and Fingering by the Right Upper Extremity</u>

Eaglebarger first takes issue with the VE's testimony that the spotter, final assembler, and sorter jobs, which according to the DOT require either "frequent" or "constant" handling, could be performed with only "occasional" handling and fingering by the right upper extremity. She argues that the ALJ's step five assessment of whether a claimant can perform other work must be based upon the functional demands and duties of the job as ordinarily performed in the national economy, "not what may be isolated variations in job demands . . . ." (Opening Br. 17.)

Indeed, "[i]t is error for a VE to cite jobs based on assumptions about employer accommodations, rather than on how the jobs are normally performed in the competitive job market." 3 SOCIAL SECURITY DISABILITY CLAIMS PRACTICE AND PROCEDURE § 27.62 (2nd ed.) "Whether or how an employer might be willing (or required) to alter job duties to suit the limitations of a specific individual would not be relevant because [the ALJ's] assessment must be based on broad vocational patterns . . . rather than on any individual employer's practices." Memorandum from Daniel L. Skoler, Associate Commissioner for Hearings and Appeals to

8

Administrative Appeals Judges, reprinted in 2 SOCIAL SECURITY PRACTICE GUIDE, App. § 15C(9), pp. 15-401 to 15-402 (2011); *see also Eback v. Chater*, 94 F.3d 410, 412 (8th Cir. 1996); *Sullivan v. Halter*, 135 F. Supp. 2d 985, 987 (S.D. Iowa 2001).

That is, "when the SSA determines whether an individual is disabled for SSDI purposes, it does not take the possibility of 'reasonable accommodations' into account . . . ." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 803 (1999) (emphasis omitted); *see Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999) ("[A] vocational expert should not base his determination of the availability of jobs on the assumption that the ADA requires an employer to accommodate an individual's disability."); *Widener v. Astrue*, No. 08-107-DLB, 2009 WL 2778215, at *4 (E.D. Ky. Aug. 27, 2009). "To support a fifth-step finding that an individual can perform 'other work,' the evidence (e.g., vocational expert testimony) would have to show the job, which is within the individual's capacity because of employer modifications, is representative of a significant number of such jobs in the national economy." SKOLER *supra* pp. 15-401 to 15-402; *see also Eback*, 94 F.3d at 412.

Here, contrary to Eaglebarger's assertion, the VE did not run afoul of the foregoing principles when she testified that a hypothetical individual of Eaglebarger's age, education, and experience with her assigned RFC could perform a significant number of jobs in the economy. To explain, the ALJ began by posing a hypothetical to the VE describing an individual of Eaglebarger's age, education, and experience with Eaglebarger's RFC, but without any upper extremity manipulation limitations. (Tr. 77.) The VE responded that such an individual could perform the jobs of spotter (100 to 150 in the region, 3,000 in the state, and 500,000 nationally), final assembler (200 to 250 in the region, 10,000 in the state, and 300,000 nationally), and sorter

(100 to 150 in the region, 3,000 in the state, and 200,000 nationally). (Tr. 76-77.)

Next, the ALJ asked the VE whether the number of jobs would be reduced if the foregoing hypothetical individual would also be limited to "occasional handling or gross manipulation with the right upper extremity." (Tr. 77.) To this question, the VE responded: "No. . . . I don't think the numbers would be reduced. I think the positions could still be performed as they normally are within the . . . national standard." (Tr. 77.) The ALJ then asked the VE to further limit that same hypothetical individual to only occasional fine manipulation or fingering, to which the VE answered: "[M]y answer would be the same . . . ." (Tr. 78.) The VE explained that her conclusion was based upon her observation of people employed in those positions, rather than the DOT. (Tr. 78.) Therefore, the VE did indeed definitively represent that the spotter, final assembler, and sorter jobs, when performed with only "occasional" handling and fingering by the right upper extremity, are "representative of a significant number of jobs in the national economy." SKOLER *supra* pp. 15-401 to 15-402.

Moreover, the VE never suggested that this hypothetical individual might require a "reasonable accommodation" in order to perform the work or that she assumed an employer would be willing to make such accommodations. *Cf. Eback*, 94 F.3d at 412 (reflecting that the vocational expert testified that he "assumed" that an employer would allow the necessary nebulizer use on the job because it would be a "reasonable accommodation that an employer could or should make, particularly considering the ADA"); *Sullivan v. Halter*, 135 F. Supp. 2d 985, 987 (S.D. Iowa 2001) (indicating that the vocational expert testified that a "library clerk" needed to use a telephone and, therefore, that a "special accommodation for a specially equipped telephone would need to be made" in order for plaintiff to perform that work). Nor did the VE

10

testify that the hypothetical individual's employability was contingent on whether an employer was willing to make an accommodation. *Cf. Eback*, 94 F.3d at 412 (reflecting that the vocational expert affirmatively stated his opinion about plaintiff's employability would change if an employer was not willing to make the accommodation).

Rather, the VE testified that the number of spotter, final assembler, and sorter jobs would *not* be reduced by the addition of manipulation limitations to the hypothetical individual's RFC. This testimony by the VE was based not merely on an assumption, but rather, on her personal knowledge gained through her observation of people employed in such positions. *See Jones*, 174 F.3d at 693 (finding that the ALJ properly relied on the vocational expert's testimony where his "reference to the ADA suggests not that he assumed that assembler jobs required accommodation, but that allowing for an employee to alter between sitting and standing is a prevalent accommodation in the workplace"); *Pena v. Apfel*, No. C-97-4445-VRW, 1999 WL 155699, at *2 (N.D. Cal. Mar. 15, 1999) (concluding that the ALJ's step five finding was supported by substantial evidence where it was "based strictly on the [vocational expert's] knowledge that jobs frequently allow for alternate standing and sitting"). Therefore, the ALJ was entitled to rely on the VE's testimony about the number of spotter, final assembler, and sorter jobs in the economy that a hypothetical individual with Eaglebarger's RFC could perform.

As a result, Eaglebarger's first challenge to the ALJ's step five finding does not warrant a remand of the Commissioner's final decision.

2. The ALJ Properly Resolved the Conflicts Between the VE's Testimony and the DOT

Next, Eaglebarger alleges that the ALJ improperly resolved the conflict between the DOT and the VE's testimony concerning the spotter, final assembler, and sorter jobs. To review,

11

the DOT represents that these jobs require "frequent" to "constant" handling, while the VE testified that the jobs could be performed competitively with only "occasional" handling or gross manipulation of the right upper extremity. Eaglebarger contends, albeit unsuccessfully, that the ALJ erred by relying on the VE's testimony instead of the DOT.

Of course, "[n]either the DOT nor the VE . . . evidence automatically 'trumps' when there is a conflict." SSR 00-4p; *see Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002) ("The position . . . that the *Dictionary* always wins is untenable."). "The adjudicator must resolve the conflict by determining if the explanation given by the VE . . . is reasonable and provides a basis for relying on the VE . . . testimony rather than on the DOT information." SSR 00-4p; *see Overman v. Astrue*, 546 F.3d 456, 464 (7th Cir. 2008) ("An ALJ is free to accept testimony from a VE that conflicts with the DOT when, for example, the VE's experience and knowledge in a given situation exceeds that of the DOT"s authors . . . ."); *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003) ("[T]he ALJ was permitted to rely on the VE's opinion, even if the VE contradicted the DOT.").

Here, the VE specifically explained that her testimony about the spotter, final assembler, and sorter positions was "based on [her] observation of people employed in those positions." (Tr. 78.) And, earlier in the hearing, she generally represented her testimony was based on her "knowledge, education, training, and experience." (Tr. 71.)

The ALJ expressly recognized the conflict between the DOT and the VE's testimony, and ultimately opted to rely on the VE's testimony. (Tr. 42.) The ALJ explained that she found the VE's testimony on the matter to be "reasonable" and "based on her experience in the vocational field, including her experience observing individuals performing jobs." (Tr. 42); *see, e.g.*, *Auer*

*v. Astrue*, No. 3:09-cv-340, 2010 WL 2813808, at *11 (N.D. Ind. July 15, 2010) (affirming the ALJ's resolution of a conflict between the DOT and the vocational expert's testimony in favor of the expert where her testimony was based on her own knowledge, experience, and professional research); *Wright v. Astrue*, No. 08-cv-231, 2008 WL 4829950, at *17 (W.D. Wis. Oct. 27, 2008) (concluding that the ALJ properly resolved a conflict between the DOT and the vocational expert's testimony in favor of the expert where his testimony was based on his own personal knowledge of how the jobs at issue were performed). Thus, contrary to Eaglebarger's assertion, the ALJ did indeed properly confront and resolve the conflict and then adequately explained her reasoning in the decision. *See* SSR 00-4p ("The adjudicator will explain in the . . . decision how he or she resolved the conflict.").

Not to be deterred, Eaglebarger contends that "experience" is an insufficient basis upon which to base a vocational expert's opinion. As she tells it, her attorney challenged the foundation of the VE's testimony at the hearing, and thus the ALJ had a duty to question the VE's basis for the opinion but failed to do so. (Opening Br. 20 (citing *Donahue*, 279 F.3d at 445 ("If the basis of the vocational expert's conclusions is questioned at the hearing, . . . then the ALJ should make an inquiry . . . to find out whether the purported expert's conclusions are reliable.").)

Eaglebarger, however, is stretching the record in this respect. While her attorney did cross examine the VE about the requirements of the spotter job, he *did not* question the foundation for her opinion or request her underlying data and reasoning. (*See* Tr. 79-82, 151-54.) "When no one questions the vocational expert's foundation or reasoning, an ALJ is entitled to accept the vocational expert's conclusion, even if that conclusion differs from the

13

*Dictionary*'s–for the *Dictionary*, after all, just records other unexplained conclusions and is not even subject to cross-examination." *Donahue*, 279 F.3d at 446; *see Barrett v. Barnhart*, 355 F.3d 1065, 1067 (7th Cir. 2004) (emphasizing that where the claimant's "lawyer did not question the basis for the vocational expert's testimony, purely conclusional though that testimony was, any objection to it is forfeited"); *Valla v. Astrue*, No. 3:07-cv-370, 2008 WL 3992655, at *17 (W.D. Wis. Feb. 8, 2008) (concluding that the ALJ was entitled to rely on the vocational expert's numbers where claimant's attorney asked the expert whether his testimony was inconsistent with the DOT but failed to ask him "about the genesis of the numbers").

Therefore, neither of Eaglebarger's two challenges to the ALJ's step five finding warrant a remand of the Commissioner's final decision. Accordingly, the Commissioner's decision will be affirmed.

## IV. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Eaglebarger.

SO ORDERED.

Enter for this 23rd day of February, 2012.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge